DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Fairview Radiology, P.C., | ) | |
| | ) | CASE NO. 3:04CV7262 |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Memorandum Opinion and Order |
| | ) | (Resolving Doc. Nos. 55, 56) |
| Defiance Hospital, Inc., et al., | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

## I. Introduction

Plaintiff Fairview Radiology, P.C. has sued Defendants Defiance Hospital, Inc. and Dr. Edrick Ferguson each for breach of contract, tortious interference with a contract, tortious interference with a business relationship, and civil conspiracy. Before the Court are Defiance Hospital and Dr. Ferguson's Motions for Summary Judgment on all claims (Doc. Nos. 55, 56). Fairview has filed a Response (Doc. No. 61), and Defiance Hospital has filed a Reply (Doc. No. 66).

Defendants' Motions for Summary Judgment are DENIED with respect to Fairview's breach of contract claims because questions of material fact remain regarding both claims. Likewise, Dr. Ferguson's Motion for Summary Judgment is DENIED with respect to Fairview's tortious interference with a contract and tortious interference with a business relationship claims because questions of material fact remain regarding those claims. Defiance Hospital's Motion for Summary Judgment, however, is GRANTED with respect to Fairview's tortious interference with a contract and tortious interference with a business relationship claims because Defiance Hospital did not induce Dr. Ferguson

(3:04CV7262)

to breach any contract or to terminate any business relationship that he may have had with Fairview.

Further, both Defiance Hospital and Dr. Ferguson's Motions for Summary Judgment are GRANTED

with respect to Fairview's civil conspiracy claim.

## II. Background

On August 14, 2000, Plaintiff Fairview Radiology, P.C. contracted to provide radiology

services to Defendant Defiance Hospital, Inc., for two years under a Professional Services Agreement

(the PSA).  Fairview and Defiance Hospital later executed two addenda to the PSA.  The first

addendum, executed on August 11, 2002, extended the termination date of the PSA to December 31,

2002.  On January 1, 2003, Fairview and Defiance executed the second addendum, which extended

the termination date further, until January 31, 2003.  On January 8, 2003, however, Defiance Hospital

sent a letter to Fairview noticing the termination of the PSA effective January 25, 2003.  On January 9,

2003, Defiance Hospital entered into a professional services agreement with Dr. Edrick Ferguson, a

radiologist whom Fairview recruited, to provide it radiology services.

### A. The Fairview-Defiance Hospital Relationship

The PSA required Fairview to provide "radiological interpretation for all modalities in the

imaging department on 24 hours, seven days per week, 365 days per year."  In exchange, "Defiance

Hospital agree[d] not to contract with, employ or credential any radiologist who is not a Practice

Physician during the term of this Agreement." (Doc. No. 60, Exh. 1, PSA § 1.1.)  The PSA defines a

"Practice Physician" as "each and every physician or other medical professional who has been granted

privileges to perform Professional Services at Defiance Hospital and is in any way professionally

(3:04CV7262)

associated with Practice [Fairview] in the rendering of Professional Services to Defiance Hospital's

patients, including but not limited to employees of Practice and locum tenens physicians." (Doc. No.

60, Exh. 1, PSA § 2.1.)  Defiance Hospital also agreed to refrain from soliciting the services of any

Practice Physician or otherwise interfering with any of Fairview's contractual relationships during the

term of the PSA and for two years following its termination.[1]

> During the term of this Agreement and for two years following the termination of this Agreement, Defiance Hospital shall not, directly or indirectly, individually or collectively, in any fashion, form or manner, without the express written approval of Practice [Fairview], employ, engage, contract in any manner for the services of, induce or solicit the services of any Practice Physician or otherwise interfere with any contractual relationship of Practice.

(Doc. No. 60, Exh. 1, PSA § 16.2.)  Defiance and Fairview also agreed that either party could

terminate the PSA at any time without cause so long as it provided 120 days written notice.

During the summer of 2002, Fairview and Defiance Hospital began negotiating for a long term

extension of the PSA.  John Horns, Kathy Boff, and Terry Jacobs were negotiating on behalf of

Defiance Hospital, and Dr. Frank Fayz represented Fairview.  To facilitate the negotiations, and to

ensure that Defiance Hospital continued receiving radiology services, the parties executed the two

addenda referred to above.  In addition to extending the termination date of the PSA, the first

addendum decreased the amount of written notice that was required before a party could terminate the

PSA without cause to 15 days.  (Doc. No. 60, Exh. 2.)

During the renewal negotiations, Defiance Hospital expressed its concern with the quality of

_____

[1]Fairview agreed to a reciprocal term, but that provision is not at issue in this dispute.

3

(3:04CV7262)

services provided to it by Fairview.  Defiance Hospital believed that these problems arose because

Fairview and Dr. Fayz were located in Detroit and because Fairview had difficulty recruiting and

retaining radiologists.  Dr. Fayz claims that, during a meeting on August 13, 2002,  Horns agreed to

extend the PSA by two years pending Fairview's successful recruitment of an acceptable radiologist.

Dr. Fayz claims that Horns told him that "once you find that physician, we'll [Defiance Hospital] go

ahead and award the contract for another two years."   (Doc. No. 60, Exh. , pp. 121-22.)   Defiance

Hospital, however, would terminate the PSA before the conclusion of the second addendum.

### B. The Fairview-Dr. Ferguson Relationship

In July 2002, Fairview placed an advertisement on the American College of Radiology website

soliciting applications for a radiologist to be located in Defiance (at Defiance Hospital) or Port Clinton

(at another facility Fairview serviced).  On July 23, 2002, Dr. Ferguson responded to this

advertisement, indicating his desire to work from December 2002 through May 2003.  Dr. Fayz, on

behalf of Fairview, and Dr. Ferguson then began negotiating an employment agreement.  During these

negotiations, Dr. Fayz claims that he informed Dr. Ferguson of Fairview's contractual relationship with

Defiance Hospital.

On August 16, 2002, Fairview sent Dr. Ferguson a letter offering him full-time on-site general

radiologist employment.  The letter confirmed that Dr. Ferguson would be paid $55,000 per month,

that he would start October 14, 2002, and that Dr. Ferguson's responsibilities "would include all

professional radiology interpretations, light interventional procedures, and interim Medical Director-

related responsibilities." (Doc. No. 60, Exh. 3.)  It also stated that Dr. Ferguson would be placed at a

4

(3:04CV7262)

hospital in either South Haven, Michigan or Port Clinton, Ohio.  It concluded by stating that "[i]f this is acceptable to you [Dr. Ferguson], I would appreciate signing below as confirmation for placement." (Doc. No. 60, Exh. 3.)  The letter was signed by Dr. Fayz, and Dr. Ferguson signed it on August 26, 2002.

Apparently, Dr. Ferguson was not satisfied with the terms of this agreement, and the parties continued their negotiations.  On October 2, 2002, Fairview sent another letter to Dr. Ferguson this time offering a "long-term locum tenens Agreement to you [Dr. Ferguson] for coverage at our Defiance, Ohio facility commencing October 14, 2002."  (Doc. No. 60, Exh. 8.)  This Letter also included a description of Dr. Ferguson's responsibilities and rate of pay, and requested that he sign it.  Dr. Ferguson signed the Letter on October 5, 2002, but added an addendum that the agreement was pending his ability to terminate his contract with Southside Community Hospital.  Fairview did not respond to this additional term.

Dr. Ferguson later contacted Fairview and indicated that he could not terminate his contract with Southside until the end of 2002.  It is unclear whether Dr. Ferguson made any attempt at all to terminate his agreement with Southside.  Regardless, Fairview and Dr. Ferguson continued their negotiations.  Fairview claims that, through Dr. Fayz, it verbally agreed with Dr. Ferguson to modify the October 2, 2002 letter to extend the start date to January 6, 2002.  Fairview sent Dr. Ferguson another letter memorializing the terms of this agreement on November 14, 2002.  This letter stated that it "supercedes previous Agreement signed October 2, 2002." (Doc. No. , Exh. L.)  It also contained terms of the agreement, including rate of pay and a description of services.  Additionally, as with the

5

(3:04CV7262)

previous letters, this letter concluded by stating that "[y]our [Dr. Ferguson's] signature below serves as

acceptance of the above assignment and terms."  (Doc. No. Exh. L.)  Dr. Ferguson, however, never

signed the letter.

Apparently, Dr. Ferguson did not have any intention of working for Fairview.  Dr. Ferguson

testified that he never had any real intention of working for Fairview if he could possibly avoid it.  (Doc.

No. 60, Exh. 19, p. 74.)  Dr. Ferguson also stated that "after [he] met Dr. Fayz it was clear in [his]

mind that [he] could not work for him based on the interactions that occurred during [his] on-site

interview." (Doc. No. 60, Exh. 19, p. 40.)  Indeed, Dr. Ferguson indicated that he felt his indication

that he could not terminate his contract with Southside "was a nice way of saying what [he] didn't want

to say."  (Doc. No. 60, Exh. 19, p. 80.)

### C. Defiance Hospital's Contact with Dr. Ferguson

After Dr. Ferguson initially contacted Fairview and indicated his interest in the position,

Fairview sent a letter of introduction, Dr. Ferguson's CV, and his references to Defiance Hospital on

August 29, 2002.  The letter confirmed Fairview's recruitment of Dr. Ferguson and scheduled a tour of

Defiance Hospital on September 7, 2002.  Dr. Ferguson, however, cancelled his trip and the tour.

The August 29, 2002 letter also indicated Dr. Ferguson's verbal commitment to begin working

for Fairview on October 14, 2002.  Dr. Fayz also testified that he told Defiance Hospital that he had

signed Dr. Ferguson.  When Dr. Ferguson indicated to Fairview that he could not terminate his contract

with Southside, Dr. Fayz claims that he called Defiance Hospital and told Jacobs that Dr. Ferguson had

requested an extension.  Defiance Hospital contends that Dr. Fayz called and said that Dr. Ferguson

6

(3:04CV7262)

was no longer a candidate for the job.

Dr. Ferguson did travel to Detroit to meet with Dr. Fayz on November 12 and 13, 2002. During that meeting Dr. Ferguson reiterated his intention to begin working for Fairview on January 6, 2003. Dr. Fayz suggested that Dr. Ferguson stop by Defiance Hospital for a tour of the facility on his way home. That day, Dr. Ferguson stopped by Defiance Hospital and met with Jacobs. Dr. Ferguson testified that he made it clear that he was there in connection with his potential employment with Fairview. (Doc. No. 60, Exh. 19, p.53.) Defiance Hospital, conversely, contends that the meeting was impromptu and unplanned.

Three days later, Dr. Ferguson called Jacobs on the telephone. During their conversation, Dr. Ferguson indicated that he was not interested in working for Fairview and inquired whether Defiance Hospital would be interested in contracting with him directly.[2] Jacobs, uncertain what to do, contacted Horns, and Horns instructed Jacobs to have Dr. Ferguson put his offer in writing. On November 18, 2002, Dr. Ferguson submitted two offers to Jacobs, one reflecting a daily rate and one reflecting a monthly rate. (Doc. No. 60, Exhs. 9, 10.) Jacobs also verified with Dr. Ferguson that he did not have a contractual relationship with Fairview.

On December 2, 2002, Dr. Ferguson signed a confidentiality agreement with Defiance Hospital. On January 8, 2003, Defiance Hospital sent Fairview a letter providing notice that the PSA would terminate on January 25, 2003. While the PSA was terminated on January 25, 2003, Defiance

---

[2]Dr. Ferguson testified that he did not contact Defiance Hospital regarding a direct contract with them until January of 2003.

7

(3:04CV7262)

Hospital paid Fairview through January 30, 2003.  On January 9, 2003, Dr. Ferguson entered into a professional services agreement with Defiance Hospital to provide services similar to those provided by Fairview.

On May 13, 2004, Fairview filed this suit against Defiance Hospital and Dr. Ferguson. Defiance Hospital and Dr. Ferguson have now moved for summary judgment.

### III. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990).  Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been

8

(3:04CV7262)

made, which contradicts . . . earlier deposition testimony." Reid v. Sears Roebuck & Co., 790 F.2d

453, 460 (6th Cir. 1986) (citing Biechell v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984)); but

see Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need

not be disregarded if there is "independent evidence in the record to bolster [the] otherwise

questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting Anderson

v. Liberty Lobby, 477 U.S. at 252).

      In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the

need for a trial – whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, 477 U.S. at 250.  Put another way, this Court must determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." Id. at 251-52.  See also Wexler v. White's Fine

Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can

be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

### IV. Discussion of Law

### A. Breach of Contract Claims

      Fairview claims that both Defiance Hospital and Dr. Ferguson breached contracts with it.  "To

prevail on a breach of contract, the party asserting the breach must present the following: a contract did

9

(3:04CV7262)

indeed exist, the party asserting the breach performed, the other party breached the contract, and the

non-breaching party suffered damages." Regency Ctr. Dev. Co., Ltd. v. Constr. Dimensions, Inc.,

2003-Ohio-5067, ¶ 57 (Ohio Ct. App. 2003) (citing Doner v. Snapp, 98 Ohio App.3d 597, 600

(Ohio Ct. App. 1994)).   Fairview asserts that Defiance Hospital breached §§ 1.1 and 16.2 of the PSA

and that Dr. Ferguson breached its agreement with him.

## 1. Defiance Hospital

### a. Section 1.1

Section 1.1 of the PSA states that "Defiance Hospital agrees not to contract with, employ or

credential any radiologist who is not a Practice Physician during the term of this Agreement."  Defiance

Hospital contends that it is entitled to summary judgment because it paid Fairview through the end of

January 2003 pursuant to the PSA, and Fairview, therefore, was not damaged as a result of any breach

of § 1.1 of the PSA.  The last signed addendum to the PSA extended it through the end of January

2003.  Fairview admits that it was paid through the end of January 2003 pursuant to the PSA.

Fairview, however, asserts that Defiance Hospital orally agreed to enter into a two-year extension of

the PSA upon Fairview's recruitment of another radiologist and, because Defiance Hospital's breach of

the PSA prevented it from fulfilling its obligation under this agreement, it is entitled to damages for that

two-year period.[3]  Section 1.1 is meant to protect Fairview's interest in its business relationship with

Defiance Hospital.  Consequently, any breach of that section which damaged or interfered with the

---

[3]Defiance Hospital argues that the Court should not consider this argument because it is a new claim.  Fairview, however, is not asserting a new claim but rather articulating its theory of damages on claims already asserted.

10

(3:04CV7262)

business relationship between Defiance Hospital and Fairview would result in damages to Fairview.

Defiance Hospital contends that it did not enter into an oral agreement to enter into a two-year

extension of the PSA.  Thus, whether Fairview and Defiance Hospital entered into an oral agreement to

enter into a two-year extension of the PSA remains a question of fact.

Defiance Hospital contends that this purported agreement violates the Statute of Frauds.

Ohio's Statute of Frauds, Ohio Rev. Code § 1335.05, requires that agreements which cannot be

completed in one year be in writing.

> No action shall be brought whereby to charge the defendant . . . upon an agreement
> that is not to be performed within one year from the making thereof; unless the
> agreement upon which such action is brought, or some memorandum or note thereof, is
> in writing and signed by the party to be charged therewith or some other person
> thereunto by him or her lawfully authorized.

Ohio Rev. Code § 1335.05.  Further, an oral modification or extension of an agreement is rendered

unenforceable by the Statute of Frauds if that modification cannot be performed within one year.

Conneaut Dev., Inc. v. F.D.I.C., No. 94-3687, 1996 WL 15643 (6th Cir. Jan. 16, 1996) (citing

Nonamaker v. Amos, 73 Ohio St. 163 (1905)).

Defiance Hospital asserts that because Fairview contends that they purportedly orally agreed to

a two-year extension of the PSA and has presented no evidence of a writing containing its terms that

the agreement is unenforceable under the Statute of Frauds because it could not be performed within

one year.  Defiance Hospital, however, misconstrues Fairview's claim.  Fairview claims that Defiance

Hospital orally agreed to enter into a two-year extension of the PSA upon Fairview's recruitment of an

acceptable radiologist.  In other words, Fairview asserts an oral contract to contract.  Fairview could

11

(3:04CV7262)

have recruited an acceptable radiologist within one year of entering into this agreement with Defiance

Hospital (indeed, Fairview contends that it actually did retain an acceptable radiologist, Dr. Ferguson).

At that time, Defiance Hospital would have been obligated to enter into a two-year extension of the

PSA, which the Statute of Frauds would have required to be in writing.  Defiance Hospital's alleged

breach of the PSA interfered with Fairview's ability to contract with an acceptable radiologist.

Whether Fairview was damaged by Defiance Hospital's alleged breach of the PSA, therefore, remains

a question of fact.  Consequently, Defiance Hospital is not entitled to summary judgment on Fairview's

breach of contract claim.[4]

### b. Section 16.2

Section 16.2 of the PSA prohibits Defiance Hospital from interfering with any of Fairview's

contractual relationships.

> During the term of this Agreement and for two years following the termination of this Agreement, Defiance Hospital shall not, directly or indirectly, individually or collectively, in any fashion, form or manner, without the express written approval of Practice, employ, engage, contract in any manner for the services of, induce or solicit the services of any Practice Physician or *otherwise interfere with any contractual relationship of Practice.*

---

[4]The Court is uncertain if Defiance Hospital is also arguing that § 1.1 merely prevents it from employing a radiologist during the term of the PSA.  Fairview argues that merely entering into a contract with a radiologist during the term of the PSA constitutes a breach of § 1.1.  As discussed below, it is the role of the trier of fact to resolve any ambiguity in the terms of a contract.  Section 1.1 prohibits Defiance Hospital from "contracting with . . . any radiologist . . . during the term of this Agreement." The parties offer two interpretations of this term; therefore it is ambiguous.  Defiance Hospital entered into an agreement with Dr. Ferguson on January 9, 2003, while the PSA was still in effect.  Thus if merely entering into a contract with a radiologist violates § 1.1, Defiance Hospital would have breached the contract.  The ambiguity of § 1.1, therefore, is a genuine issue of material fact to be resolved at trial.

12

(3:04CV7262)

(Emphasis added.)  Defiance Hospital argues that it could not have breached § 16.2 because there was

no contractual relationship between Fairview and Dr. Ferguson with which it could interfere.  Defiance

Hospital entered into a contract with Dr. Ferguson in January of 2003.  Fairview contends that it had a

contract with Dr. Ferguson which required him to begin working for Fairview in January of 2003.  As

discussed below, whether Fairview actually had a contract with Dr. Ferguson remains a question of

disputed fact.  Whether Fairview and Dr. Ferguson had a contractual relationship with which it could

interfere, therefore, also remains a question of fact.

      Defiance Hospital alternatively argues that it could not have breached § 16.2 because it was not

aware of any contractual relationship between Fairview and Dr. Ferguson and it did not interfere with

any such relationship.  First, Dr. Fayz testified that he notified Defiance Hospital that Fairview had

signed Dr. Ferguson.  Thus it is at least a question of fact whether Defiance Hospital was aware of any

contractual relationship.  Second, the definition of the term "interfere" is ambiguous.  "A contract is

ambiguous if its terms are susceptible to more than one interpretation[,]" and "[i]t is generally the role of

the trier of fact to resolve any ambiguity."  Preload, Inc. v. R.E. Schweitzer Constr. Co., 2004-Ohio-

2278, ¶5 (Ohio Ct. App. 2004).  Interfere means "to interpose in a way that hinders or impedes: come

into collision or be in opposition" or "to enter into or take part in the concerns of others."  Webster's

New Collegiate Dictionary 597 (1979).  Interfere can also mean the more limited definition utilized in

tortious interference with a contract claim, "the wrongdoer's intentional procurement of the contract's

breach."  Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 419 (1995).  Here,

depending on the definition of the term "interfere" in the PSA, Defiance Hospital's conduct could be

13

(3:04CV7262)

construed as either breaching the agreement or as harmless conduct.  Thus the definition of "interfere" is

a genuine issue of material fact.  Defiance Hospital, therefore, is not entitled to summary judgment on

Fairview's breach of contract claim.

### 2. Dr. Ferguson

Dr. Ferguson contends that he is entitled to summary judgment because he did not enter into a

contract with Fairview.  "To prove the existence of a contract, a party must establish the essential

elements of a contract: an offer, an acceptance, a meeting of the minds, an exchange of consideration,

and a certainty as to the essential terms of the contract."  Juhasz v. Costanzo, 144 Ohio App. 3d 756,

762 (Ohio Ct. App. 2001) (citing Nilavar v. Osborn, 127 Ohio App. 3d 1, 11 (Ohio Ct. App. 1998)).

"The terms of a written contract may be modified by the subsequent acts and agreements of the

parties." Ryan v. Terra Vista Estates, Inc., 102 Ohio App.3d 474, 480 (Ohio Ct. App. 1995).

On October 2, 2002, Fairview sent a letter (the Agreement) to Dr. Ferguson detailing the terms

of their agreement, including the rate of pay, and providing a space for Dr. Ferguson to indicate his

acceptance by signing the letter.  On October 5, 2002, Dr. Ferguson signed the Agreement.  Dr.

Ferguson contends that the Agreement does not constitute the final agreement of the parties because

negotiations between the parties continued after he signed it.  As Ryan states, however, a written

contract may be modified by subsequent agreements between the parties.  To reach these subsequent

agreements, parties must be able to enter into negotiations regarding modifications.  Thus the fact that

the parties negotiated regarding terms of the agreement subsequent to Dr. Ferguson's signing the

Agreement does not render the Agreement unenforceable as a matter of law.  Dr. Ferguson's argument

14

(3:04CV7262)

could also be construed as asserting that there was no meeting of the minds and that the terms of the

Agreement were not definite.  Dr. Ferguson, however, signed the Agreement and the Agreement

contains definite terms regarding his salary.  Thus whether there was a meeting of the minds and

whether the Agreement contains definite terms is at least a question of fact.

Dr. Ferguson further argues that Fairview abandoned the Agreement.  "[S]ubsequent to the

execution of a written contract, it is competent for the parties, by a new contract, although not in

writing, either to abandon, waive, or annul, the prior contract, or vary, or qualify the terms of it in any

manner."  Thurston v. Ludwig, 6 Ohio St. 1, 5 (1856), quoted in Citizens Fed. Bank, F.S.B. v.

Brickler, 114 Ohio App.3d 401, 407-08 (Ohio Ct. App. 1996)).  On November 14, 2002, Fairview

proposed a new written agreement with Dr. Ferguson in another letter.  This agreement stated that it

"supercedes previous signed Agreement dated 10-2-02."  As indicated in Thurston and Ryan, parties

may modify written agreements subsequent to their execution.  Offering a subsequent agreement that

supercedes a previous agreement does not render the previous agreement unenforceable if there is no

acceptance of the subsequent agreement.  Thus Fairview's proposed new written agreement does not

render the Agreement unenforceable as a matter of law.  Furthermore, Thurston requires a new

contract to abandon the previous agreement.  Dr. Ferguson, however, presents no evidence of a new

contract; indeed, only Fairview asserts that a new contract existed and Dr. Ferguson disputes this

assertion.  Moreover, that Fairview felt it necessary to indicate in the November 14, 2002 letter that it

superceded the Agreement evinces Fairview's belief that the Agreement was binding and enforceable.

Thus whether Fairview abandoned the Agreement remains at least a question of fact.

(3:04CV7262)

Dr. Ferguson alternatively argues that he did not breach the Agreement because his

performance was conditioned upon the termination of his ability to terminate his contract with Southside

Community Hospital.  Because Dr. Ferguson was unable to terminate his contract with Southside prior

to the October 14, 2002 start date contained in the Agreement, he contends that his performance was

excused.  Fairview, however, asserts that it orally agreed with Dr. Ferguson to modify the Agreement

to delay the start date until January of 2003, which would accommodate Dr. Ferguson's contract with

Southside.  <u>Thurston</u> clearly permits oral modifications of written agreements.  Thus whether the

Agreement was orally modified is a question of fact, and Dr. Ferguson is not entitled to summary

judgment.[5]

---

[5]Defiance Hospital argues in support of its Motion for Summary Judgment regarding the tortious interference with a contract claim that the October 2, 2002 Agreement does not constitute a contract because Dr. Ferguson's addition of the condition that he be able to terminate his contract with Southside rendered his signature a counteroffer, not an acceptance.  Because Fairview never indicated that it accepted this condition, Defiance Hospital argues that no contract was created.  This argument fails for two reasons.  First, while silence generally is insufficient to constitute acceptance, "[w]here the relationship between the parties justifies an expectation of a reply, however, silence in response to the offer may constitute an acceptance."  <u>Nilavar v. Osborn</u>, 137 Ohio App.3d 469, 488 (Ohio Ct. App. 2000) (citing <u>Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.</u>, 54 Ohio St. 2d 147, 152 (1978)).  Here, Fairview and Dr. Ferguson had engaged in extensive negotiations over the contract and Dr. Ferguson signed the Agreement and added his condition after Fairview had signed it.  Under such circumstances, the parties relationship may justify a reply.  Thus it is a question of fact whether Fairview's silence constituted an acceptance.  Secondly, Fairview claims that it later orally agreed with Dr. Ferguson to modify the Agreement.  Any acceptance issues related to Dr. Ferguson's additional condition would be remedied by this subsequent agreement.  As discussed above, however, whether this oral modification ever occurred remains a question of fact.

Defiance Hospital further argues that the November 14, 2002 offer supercedes the Agreement. As discussed above, the mere existence of the November 14, 2002 letter does not render the Agreement unenforceable.  Moreover, Fairview contends that the November 14, 2002 letter was meant to memorialize the oral agreement modifying the Agreement that it had entered into with Dr. Ferguson.  Defiance Hospital argues that because Dr. Ferguson did not sign the letter, there was no

16

(3:04CV7262)

## B. Tortious Interference Claims

Fairview also alleges claims of tortious interference with a contract and tortious interference

with a business relationship against both Defiance Hospital and Dr. Ferguson.  To establish a claim of

tortious interference with a contract a plaintiff must demonstrate four elements "(1) the existence of a

contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement

of the contract's breach, (4) lack of justification, and (5) resulting damages."  Kenty v. Transamerica

Premium Ins. Co., 72 Ohio St. 3d 415, 419 (1995), quoted in Escape Enter., Ltd. v. Gosh Enter., Inc.,

2005 Ohio 2637, ¶ 23 (Ohio Ct. App. 2005).  A tortious interference with a business relationship

"occur[s] when a person without a privilege to do so induces or otherwise purposely causes a third

person not to enter into or continue a business relation with another, or not to perform a contract with

another."  A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio

St. 3d 1, 14 (1995) (citing cases).  Thus the elements of a tortious interference with a business

relationship claim are (1) a business relationship, (2) the wrongdoer's knowledge of the relationship, (3)

the wrongdoer's intentional inducement of another not to enter into or continue the relationship, (4) lack

_____

contract.  "Parties to a contract may be bound by their oral agreements although they contemplate
executing a final written agreement containing all of the provisions upon which they agreed."  Cleveland
Sch. Dist. v. Cleveland Teacher Union, 68 Ohio App.2d 118, 124 (Ohio Ct. App. 1980) (Patton, J.,
concurring), quoted in DeHoff v. Vet. Hosp. Operations of Cent. Ohio, Inc., 2003-Ohio-3334, ¶ 55
(Ohio Ct. App. 2003).  "The question of whether the parties intended to be bound prior to the
execution of the formal written contract, is a question of intent and an issue of fact."  Cleveland Sch.
Dist., 68 Ohio App.2d at 124, quoted in Dehoff, 2003-Ohio-3334 at ¶ 55.  Thus, assuming that Dr.
Ferguson and Fairview orally agreed to modify the Agreement, whether they intended to be bound
prior to the execution of the November 14, 2002 letter becomes a question of fact.  Defiance Hospital,
therefore, is not entitled to summary judgment.

17

(3:04CV7262)

of privilege, and (5) resulting damages.

## 1. Defiance Hospital

Defiance Hospital argues that it is entitled to summary judgment on the tortious interference claims because, among other things, it did not intentionally induce Dr. Ferguson to breach any contract or to not enter into or terminate a business relationship with Fairview.  Dr. Ferguson testified that he contacted Defiance Hospital seeking to directly contract with Defiance Hospital.[6]  He told them that he did not have a contract with Fairview but had signed a letter of intent.  He also indicated that he did not believe he was bound by anything that he signed with Fairview and was looking for work in many different locations.  Dr. Ferguson further testified that, after meeting with Fayz, he did not intend to work for Fairview.  Indeed, Dr. Ferguson stated that his failure to terminate his contract with Southside was his way of indicating to Fairview that he did not want to work for Fairview.

Based on this evidence, it is clear that Dr. Ferguson had no intention of honoring any agreement or continuing any business relationship that he may have had with Fairview regardless of any contact that he may have had with Defiance Hospital.  Consequently, Defiance Hospital did not induce Dr. Ferguson to breach any contract or to discontinue any business relationship that he may have had with Fairview.  Fairview presents no evidence to the contrary.  Defiance Hospital, therefore, is entitled to summary judgment on Fairview's tortious interference claims because it did not intentionally induce Dr. Ferguson to breach any contract or discontinue any business relationship that he had with Fairview.

---

[6]While there is some dispute as to when Dr. Ferguson actually contacted Defiance Hospital, it is agreed that Dr. Ferguson initiated the talk of a direct contract.

(3:04CV7262)

## 2. Dr. Ferguson

Dr. Ferguson first argues that he is entitled to summary judgment on Fairview's tortious

interference with a contract claim because he did not have knowledge of any contract between

Defiance Hospital and Fairview.  Fayz, however, testified that he informed Dr. Ferguson that Fairview

had a contract with Defiance Hospital.  While Dr. Ferguson's testimony contradicts this statement, it

remains a disputed question of fact whether Dr. Ferguson knew of the contract between Defiance

Hospital and Fairview.

Dr. Ferguson then contends that he is entitled to summary judgment because Defiance Hospital

did not in fact breach its contract with Fairview, but rather terminated the agreement pursuant to its

terms.  Fairview, however, asserts that Defiance Hospital breached the PSA through the negotiations

leading up to the termination of the PSA, not by its actual termination of the PSA.  Thus Dr. Ferguson's

contention that Defiance Hospital did not breach the PSA by terminating it is irrelevant to the issue of

whether he induced the alleged breach of the contract.  Furthermore, as stated above, questions of fact

remain regarding whether Defiance Hospital breached the agreement.

Dr. Ferguson next argues that he is entitled to summary judgment because he did not induce

Defiance Hospital to terminate its relationship with Fairview.  He asserts that Defiance Hospital

terminated the relationship because of prior difficulties it had with Fairview.  Fairview, however, has

presented evidence that Defiance Hospital had agreed to enter into a further two-year extension with it,

if Fairview could hire an acceptable radiologist.  Defiance Hospital contends that it did not agree to

enter into this extension.  Assuming Defiance Hospital did agree to enter into the two-year extension,

19

(3:04CV7262)

whether Dr. Ferguson induced Defiance Hospital to discontinue its business relationship with Fairview

is a question of fact.

Dr. Ferguson lastly argues that he is entitled to summary judgment on the tortious interference

claims because he did not do anything willful or intentional that caused a change in status between

Fairview and Defiance Hospital and because Fairview cannot show any damages.  Dr. Ferguson

testified that he contacted Defiance Hospital regarding his providing it with radiology services.  Thus Dr.

Ferguson intended to obtain Defiance Hospital's radiology work for himself.  Consequently, whether

Dr. Ferguson's conduct was intentional remains a question of fact.  Furthermore, as discussed above,

Fairview has presented evidence that Defiance Hospital agreed to enter into a two-year extension upon

Fairview's contracting with an acceptable radiologist.  Assuming this agreement existed, Dr. Ferguson's

contracting with Defiance Hospital prevented Fairview from realizing the two-year extension.

Consequently, if the agreement to enter into the extension existed, Dr. Ferguson's interference damaged

Fairview.

## C. Civil Conspiracy

Fairview asserts that Defiance Hospital and Dr. Ferguson entered into a conspiracy to breach

their contracts with Fairview.  Under Ohio law, "a party cannot be held liable for conspiring to breach

his own contract."  Hicks v. Bryan Med. Group, Inc., 287 F. Supp.2d 795, 814 (N.D. Ohio 2003)

(citing Wagoner v. Leach Co., No. 17580, 1999 WL 961166,*20 (Ohio Ct. App. Jul. 2, 1999)).

Here, either Defiance Hospital or Dr. Ferguson was a party to any contract they conspired to breach.

Defiance Hospital and Dr. Ferguson, therefore, are entitled to summary judgment on Fairview's civil

20

(3:04CV7262)

conspiracy claim.[7]

### V. Conclusion

For the foregoing reasons, Defendant Defiance Hospital, Inc.'s Motion for Summary Judgment

(Doc. No. 55 ) and Defendant Edrick Dr. Ferguson's Motion for Summary Judgment (Doc. No. 56 ) are

GRANTED in part and DENIED in part.

IT IS SO ORDERED.


  September 1, 2005                              */s/ David D. Dowd, Jr.*
Date                                             David D. Dowd, Jr.
                                             U.S. District Judge

---

[7]Fairview purports to voluntarily dismiss its civil conspiracy claim.  A plaintiff, however, may unilaterally voluntarily dismiss a claim only before the filing of a responsive pleading or a motion for summary judgment.  Fed. R. Civ. P. 41(a)(1).

21